REVERSED
BRYSON, Circuit Judge,
dissenting.
The majority holds that “no reasonable jury could have found that Silver Spring’s devices are ‘portable’ and ‘mobile’ in the context of the claimed invention.” I disagree.
There is no room for doubt that the accused meters would qualify as mobile and portable under the ordinary meaning of those terms, and the majority does not suggest otherwise.[1] The central question in this case is whether the specifications of the '101 and '491 patents demonstrate that the patentee intended to depart from the plain meaning of those terms, ie., “capable of being easily and conveniently transported,” and to adopt the meaning proposed by Silver Spring, ie., “capable of being easily and conveniently moved ... and designed to operate without a fixed location.” The majority essentially adopts Silver Spring’s construction, and in particular the final clause requiring that the device be “designed to operate without a fixed location:”[2] I do not agree that the *1324 specifications of the two patents support that restrictive definition. Instead, I conclude that the district court properly determined that the terms “portable” and “mobile” were used in their ordinary sense in the patent, and that the court properly instructed the jury to give those terms their ordinary meaning. For that reason, I disagree with the majority’s decision that the evidence, viewed in light of the proper construction of the claims, was insufficient to support the jury’s verdict.
I
The district court determined that the plain and ordinary meaning of the terms “mobile” and “portable” is captured by two dictionary definitions to which the court referred: “capable of being carried or moved about,” Merriam-Webster’s Collegiate Dictionary 907 (10th ed. 1999); and “capable of being easily and conveniently transported,” McGraw-Hill Dictionary of Scientific and Technical Terms 1550 (5th ed. 1994). Other courts have reached similar conclusions as to the ordinary meaning of those terms. See, e.g., Orica Explosives Tech., Pty., Ltd. v. Austin Powder Co., No. CV-07-03337, 2008 WL 3914983, at *7 (C.D.Cal. Aug. 21, 2008) (“ ‘[Portable’ should be given its ordinary meaning of ‘capable of being carried.’ ”); Rosen’s Inc. v. Van Diest Supply Co., No. 03-3206, 2004 WL 692253, at *9 (D.Minn. Mar. 30, 2004) (The ordinary meaning of the term ‘portable’ is ‘capable of being carried’ or ‘easily or conveniently transported.’) (quoting Webster’s Third New International Dictionary 1768 (1993)); Google, Inc. v. Network-1 Techs., Inc., No. IPR2015-347 (P.T.A.B. June 23, 2015) (slip op. at 8-9) (“For purposes of this decision, we construe ‘portable’ according to its ordinary meaning as ‘capable of being easily and conveniently transported.’ ”). I agree with the district court that those dictionary definitions capture the plain and ordinary' meaning of these terms, and applying those definitions I agree with the district court that the evidence was sufficient to support the jury’s verdict.
The jury heard extensive testimony over four days of trial on the question whether the accused Silver Spring meters are mobile or portable. A video of the installation of the type of meters at issue was played for the jury at trial and relied upon by Silver Spring’s expert for his description of how the meters are typically installed. That video shows that the accused meters are smaller than a volleyball and can be, and are, easily carried and installed by hand. One image from the video shows the meter before it is installed:
*1325 [[Image here]]
Defendant’s Exhibit # 146.
Another image from the same video shows one of the meters installed on an electrical box attached to the outside of a building:
[[Image here]]
The video, as well as testimony at trial describe the installation process. As shown by the video, a technician installs the meter by plugging it into a socket in an electrical box on the side of the customer’s house. The technician then slips a retaining collar over the meter and bolts the collar to the electrical box to secure the meter.
*1326 [[Image here]]
The meters are plugged into and removed from the socket by hand, with no tools necessary. After the meter is plugged into the socket, a retaining ring is placed over the meter. The retaining ring is then bolted to the electrical box, securing the meter against theft. A590, at 76:11-25.
The majority regards the presence of the retaining ring and bolt as evidence that the meters are not portable. In my view, the fact that the meters need to be secured to the electrical box supports the jury’s finding that the meters are portable or mobile. A Silver Spring employee testified that the meters are locked down because the utilities “don’t want the meters to be moved” or “tampered with.” A559, at 139:4-11. Thus, the meters are locked to the electrical box precisely because they are easy to move and carry off, and they need to be secured in order to reduce the risk of loss.
The record reflects that a technician can easily carry one of the meters to a customer’s house, open the locking collar by removing a single bolt, remove the old meter by hand, plug in a new meter by hand, plug the meter into the house’s, electrical system, and replace the locking collar by tightening a single bolt, all in a matter of minutes. That evidence provides strong support for the jury’s conclusion in this case that the meters are portable or mobile.
II
Although the majority holds that “under no permissible construction” could the meters be mobile or portable, it does not state what it regards as the proper construction, nor does it describe the boundaries of what it would consider a “permissible” construction. The majority faults the district court for failing to resolve the parties’ dispute as to whether the mobile or portable limitation requires that the meters be more than “only theoretically capable of being moved.” The opinion focuses on the fact that the accused meters are bolted into place with the locking collars and are typically left in place for 15 years. From that discussion, it seems that the majority is suggesting that in order to be “portable,” the meter must actually be moved in the course of its typical use.
Actual movement in the course of ordinary use is clearly not part of the plain *1327 meaning of the term “portable.” Many objects are deemed “portable” even though they are not designed to be moved repeatedly during use. Consider an ordinary household fuse. Such fuses are very small, and they can be replaced within seconds when needed. Typically a fuse is purchased and installed in a fuse box where it remains for its entire useful lifetime, potentially many years. The advantages of the fuse’s portability are that it can easily be removed when it malfuncT tions and that a replacement can be carried by hand to the fuse box and easily installed in place of the old fuse. The fact that fuses are not typically moved from place to place during their useful lives does not make them any less portable. For the same reason, it is improper to suggest that the accused devices in this case are not “portable” simply because they are not moved from place to place during the ordinary course of their operation.
The majority’s main contention is that the specifications of the '101 and '491 patents give the terms “mobile” and “portable” some special, restrictive meaning. The majority draws from the specification the conclusion that mobile or portable units are “low-power battery operated units that are easily transported between different locations in a house, office, car, or throughout a cell territory.”
There are several problems with that conclusion. To begin with, there is nothing in either of the patents that requires the subscriber units to be battery operated, and not even Silver Spring argues to the contrary. Moreover, the characterization of the claimed devices as being “easily transported between different locations” does not exclude the accused meters. The evidence shows that the meters can easily be transported from place to place for purposes of installation or removal, even though once they are installed they are not expected to be moved until they are replaced.
In order to exclude the accused meters from the reach of the claims, it is necessary to construe the term “portable” to require that the subscriber units actually be moved from place to place in the course of their operation. While the specifications at various points describe functions that could be performed by a device that was expected to be moved in the course of its operation, there is nothing in the specifications to suggest that such movement during operation is a necessary feature of the claimed subscriber units.
To the contrary, the specifications contain examples of subscriber units that clearly would not be expected to be moved during their ordinary operation. For example, the specification of the '101 patent states that the “portable subscriber units” can perform such services as “inventory control in soft drink dispensing machines.” '101 patent, col. 6, 11. 7-8. Soft drink dispensing machines are typically left in place for long periods of time, so the incorporated subscriber units that keep track of the machine’s inventory would not be moved as part of their ordinary operation. The '101 specification also describes the use of subscriber units for “site alarms for remote monitoring of open doors, fires, failures, temperature, etc.” Id., col. 6, 11. 14-15. Again, such monitoring devices would typically be installed in the appropriate place for monitoring and would not be expected to be moved during their regular operation. The '101 specification describes one advantage of the portability of such devices as being that they could be moved to different locations in a house or office if the need arose. Id., col. 6, 11. 19-21. While portability is a benefit of the invention because it can make redeployment of such a device simple, that does not mean that the devices are necessarily ex *1328 pected to be moved during their ordinary operation, much less that they would not be deemed “portable” if they were expected to stay in the same location for an extended period of time.[3]
Although the majority contends that the specification “differentiates the claimed ‘portable’ and ‘mobile’ units from other, non-claimed ‘fixed’ and ‘stationary’ units,” the '101 specification does not support that distinction. Figures 9A and 9B of the '101 patent “illustrate portable subscriber units afforded by the invention.” '101 patent, col. 10, 11. 3-4. The portion of the '101 specification that describes those figures refers to the use of portable subscriber units to perform “automatic monitoring” functions such as “relaying an alarm or inventory reading at a subscriber’s coin operated vending machine.” Id., col. 10,11. 26-28. Again, those “monitoring” functions would not typically entail the subscriber unit being moved during ordinary operation, yet the functions are nonetheless said to be performed by the portable subscriber units depicted in Figures 9A and 9B, and described in columns 10 and 11 of the '101 specification.[4]
Thé specification of the '491 patent provides further evidence that the terms “portable” and “mobile” should not be construed restrictively. In discussing the functions of a subscriber unit, which is described as being capable of being moved, see '491 patent, col. 3, 11. 26-29; col. 4, 11. 30-36, 45-50; col. 5, 11. 61-63, the '491 specification refers to the subscriber units as having the capacity “to collect data from a number of home appliances, etc.” Id., col. 6, 11. 1-2. That is exactly the function that is performed by the accused meters in this case, and it is a function that would not ordinarily entail moving the subscriber unit during its operation. That example of a function of a mobile subscriber unit is another indication that the patent terms “portable” and “mobile” were not intended to have the restrictive meaning assigned to them by the majority.
The majority notes that many of the examples discussed in the specifications involve devices that are designed to oper *1329 ate without a fixed location. That is true, but it is beside the point. The ordinary-meaning of portable, i.e., something “capable of being easily and conveniently transported,” obviously includes devices that are moved in the course of their operation. The question is whether the meaning of the term “portable,” as used in the patents, is limited to such devices. As to that question, it doesn’t matter that many of the examples involve devices that are designed to operate without a fixed location. What matters is that the specifications contain references to devices that are easily transported, but are not ordinarily moved in the course of their operation. The specifications’ references to such devices belie the majority’s restrictive definition of “portable.”
In sum, the specification indicates that the patentee did not use the terms “portable” and “mobile” in a more restrictive sense than is suggested by their ordinary meaning. Because that ordinary meaning — something capable of being easily and conveniently transported — would clearly apply to the accused devices in this case, I disagree with the majority’s holding that the evidence cannot support the jury’s conclusion to that effect.
Ill
The majority also faults the district court for instructing the jury to interpret the terms “portable” and “mobile” according to their ordinary meanings rather than defining the terms for the jury. Notably, even if the court erred in that respect, the remedy would be, at most, a new trial, not the judgment entered today, which ends the case. Beyond that, however, I do not agree that the district court erred by directing the jury to apply the ordinary meaning of the terms.
If I am correct in finding that the '101 and '491 patents use the terms “portable” and “mobile” in accordance with their ordinary meaning, the question as to the correctness of the district court’s instruction comes down to whether, even after the court concluded that the terms were used in their ordinary sense, the court was nonetheless required to provide a separate definition of those terms for the jury. While it is sometimes unclear how far a court must go in a- patent case by way of defining claim terms, there is ordinarily no obligation to provide a special definition for terms that have a widely understood ordinary meaning, as long as the court is persuaded that the patent uses the terms in that ordinary sense.
The majority cites O2 Micro International Ltd. v. Beyond Innovation Technology Co., 521 F.3d 1351 (Fed.Cir.2008), for the proposition that it was improper for the court to rely on the plain and ordinary meaning of the two terms at issue. But 02 Micro did not state that principle in such unqualified terms. Instead, the court explained that an instruction giving a term its “plain and ordinary meaning” may be inadequate when the term has more than one ordinary meaning or when reliance on the term’s ordinary meaning does not resolve the parties’ dispute. Id. at 1361.
In this case, the close parallelism of all of the dictionary definitions indicates that there is only one plain and ordinary meaning of the terms “mobile” and “portable.” Moreover, the district court’s instruction that the jury should give those terms their plain and ordinary meaning resolved the parties’ dispute, because it was clear that Eon was relying on the plain meaning of the terms and Silver Spring was relying on a special definition of the terms that it claimed to be supported by the language of the patents. Having concluded that use of the plain and ordinary meaning of the terms was sufficient to resolve the parties’ dispute as to their meaning, the district *1330 court permissibly declined Silver Spring’s request to define the terms. See Summit 6, LLC v. Samsung Elecs. Co., 802 F.3d 1283, 1291 (Fed.Cir.2015) (“The district court rejected Samsung’s argument that ongoing activity is required — the heart of the parties’ disagreement — and declined to further construe the term because it was a ‘straightforward term’ that required no construction.... Because the plain and ordinary meaning of the disputed claim language is clear, the district court did not err by declining to construe the term.”); Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc., 249 F.3d 1341, 1349 (Fed.Cir.2001) (district court did not err in failing to construe the term “melting” when “the meaning of ‘melting! does not appear to have required ‘construction,’ or to depart from its ordinary meaning”).
Beyond that, the district court did not simply leave the parties to define the term “portable” as they saw fit. In its claim construction opinion, the court referenced the dictionary definitions of the term (“capable of being carried or moved about” and “capable of being easily and conveniently transported”), and the court directed that “the parties may not interpret [the terms portable and mobile] in a manner inconsistent with this opinion.”
As directed, the parties complied with the court’s order and interpreted the term in accordance with the dictionary definitions quoted by the court. Silver Spring’s infringement expert testified that “I think in that context, one way of characterizing mobile is to say whether they’re easily moved. And I think that’s an understanding of — a person of ordinary skill in the art would have had of that term as it was used in 1992.” Eon’s infringement expert testified similarly, saying, “According to the Court’s construction, you do not have to operate the subscriber unit while it’s being moved, that’s correct.... So what the Court was saying — saying is that mobile means capable of being easily moved. So the capability needs to be there, but not that it actually has to move.”[5]
There may be questions at the margin as to whether particular objects are “mobile” or “portable,” but in this case, the accused meters were plainly portable and mobile in the ordinary sense of those terms, for the reasons explained above. Assuming, again, that the majority is incorrect in assigning those terms a special, restrictive definition based on the language of the patents in suit, it is difficult to believe that instructing the jury with the actual language of the ordinary dictionary *1331 definitions identified by the district court could possibly have led to a different outcome in this case. Under these circumstances, I disagree with the majority that the district court committed reversible error by simply telling the jury to interpret those terms according to their ordinary meanings. I respectfully dissent.

. As the majority opinion notes, the parties agree that for the purposes of this case the terms "mobile” and “portable” carry the same meaning and can be construed the same. For simplicity, I will generally use the term "portable” to refer to both terms.

. The majority criticizes the district court's claim construction as too broad, but it never explicitly sets forth what it regards as the correct claim construction. The majority insists that its construction does not require “actual movement” or "battery operation” of the claimed devices. Elsewhere, however, the majority states (1) that the specifications’ "guidance” is that the portable units "are low-power, battery operated units that are easily transported between different locations,” and (2) that the patents "consistently describe the 'portability' feature of the invention as the movement of a low-power subscriber unit across cell boundaries.” Without *1324 the aid of an explicit construction, it seems fair to interpret the majority’s construction as generally equivalent to Silver Spring’s.

. The majority discounts the references to inventory control devices in soft drink dispensing machines and site alarms for remote monitoring of conditions in a home, on the ground that "it is impossible to tell what component of such embodiments is the portable feature.” The specification of the '491 patent, however, states that in a remote monitoring system, the subscriber units are "placed within homes” and are therefore "able to collect data from a number of home appliances, etc.’-’ '491 patent, col. 5, line 65, through col. 6, line 2. That explanation makes clear that the "subscriber unit,” the component at issue, is installed in the home and monitors appliances. The function of monitoring appliances in a home would not entail frequent movement of the device.
The specification of the related '546 patent is instructive as to the role of the subscriber unit in monitoring items such as soft drink dispensing machines. It describes the device as featuring "an automatic monitoring control mode for relaying an alarm or inventory reading at a subscriber's coin operated vending machine.” '546 patent, col. 9, 11. 63-65. That description of a device that relays alarms as to theft or other problems with the machine along with information regarding inventory clearly contemplates that the monitoring device will be associated with the dispensing machine for long periods of time, even though it can be redeployed to another machine if the owner choses to move it.

. The Brief Description of the Drawings portion of the '101 specification characterizes Figure 9A as depicting a block circuit diagram of a subscriber unit that performs "fixed or mobile communication services,” '101 patent, col. 4, 11. 61-63, such as alarm monitoring or inventory reporting. But that simply identifies the communication services provided; it does not mean that "fixed” communication services cannot be performed by "portable” subscriber units. As noted, the specification at columns 10 and 11 indicates that portable subscriber units perform precisely those “fixed” communication functions.

. The majority quotes a passage from the cross-examination of Eon's expert in which counsel for Silver Spring questioned the expert about the meaning of the word "movable”:
Q. By your logic, everything is movable, right? You can move the Eiffel Tower, right? You could?
A. Well, I don’t — I mean, I think you know, mountains are not moved. Lots of things are not movable. I mean, you know — you know, I mean, there are things that are not movable, right? .
Q. You’ve seen houses- — houses can be moved, right?
A. Well, yeah. I mean houses are — are moved.
Q. Your house is not a mobile device, is it?
A. Well, my house, you know, it can be— you know.... [I]f you have an antique home, they lift these things lock, stock, and barrel, and move them, right?
Counsel's questions in that cross-examination were directed to what is "movable,” not what is "capable of being easily moved,” which both parties’ experts testified was the meaning of "portable” in the context of this case. Eon's expert’s testimony on cross-examination therefore does not in any way conflict with the definition of "portable” that he gave on direct examination and that the district court directed the parties to adhere to.