ZIMMER TECHNOLOGY, INC. and
Zimmer, Inc., Plaintiffs,

v.

HOWMEDICA OSTEONICS
CORP., Defendant.

No. 3:02CV–425 AS.

United States District Court,
N.D. Indiana,
South Bend Division.

Feb. 22, 2007.

Bryan S. Hales, Bryce C. Pilz, Christopher R. Liro, Mark A. Pals, Stephen T. Webb, Shuaib A. Atique, Kirkland & Ellis LLP, Chicago, IL, John M. Desmarais, Kirkland & Ellis LLP, New York City, John David Ladue, Timothy Michael Curran, Boveri Murphy Rice & Ladue LLP, South Bend, IN, for Plaintiffs.

Christopher M. Scharff, Eligio C. Pimentel, Gregory J. Vogler, McAndrews Held & Malloy Ltd., Chicago, IL, Robert J. Palmer, May Oberfell Lorber, Mishawaka, IN, for Defendant.

## *MEMORANDUM, ORDER & OPINION*

ALLEN SHARP, District Judge.

This matter is before the Court on Zimmer's Second Motion for Summary Judgment on Howmedica's Invalidity Defense and Counterclaim (Docket No. 211). Oral arguments were heard on this motion in South Bend, Indiana on March 16, 2006 and August 17, 2006, and the issues have been fully briefed.

### I. JURISDICTION

Howmedica is a New Jersey corporation with its principal place of business in New Jersey. First Amended Complaint ¶ 3. It

is a wholly-owned subsidiary of the Stryker Corporation of Kalamazoo, Michigan, which designs, manufactures, and sells medical products, including prosthetic implants. *Id.* Zimmer Technology, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois. *Id.* at ¶ 1. Zimmer, Inc. is a Delaware corporation with its principal place of business in Warsaw, Indiana. *Id.* at ¶ 2. Collectively Zimmer Technology, Inc. and Zimmer, Inc. design, manufacture, and sell medical products, including prosthetic implants. This Court's jurisdiction is based on 28 U.S.C. § 1338(a). Venue is based on 28 U.S.C. §§ 1391(b) and (c).

## II. PROCEDURAL HISTORY

On April 3, 2003, the Court denied Zimmer's Motion for Summary Judgment of Infringement of U.S. Patent No. 5,290,313, entitled "Offset Prosthetic Stem Extension," and granted the Motion for Summary Judgment of Noninfringement filed by Howmedica. *Zimmer Inc. v. Howmedica Osteonics Corp.*, 258 F.Supp.2d 874 (N.D.Ind.2003). On May 26, 2004, the United States Court of Appeals for the Federal Circuit reversed and remanded the case to this Court for further proceedings in accordance with its opinion.[1] This Court entered a final claim construction order on October 12, 2005. In that order, this Court denied the parties' motions for summary judgment as premature and granted the parties leave to file new mo-

tions for summary judgment no later than January 3, 2006.[2] On January 24, 2006, Zimmer filed its Second Motion for Summary Judgment on Howmedica's Invalidity Defense and Counterclaim (Docket No. 211). Zimmer seeks an entry of summary judgment that the Loda patent and Koch application cannot anticipate any claim of the '313 patent for which Howmedica has offered no evidence of anticipation. Zimmer's motion for summary judgment also asks this Court to rule as a matter of law that the Loda patent and Howmedica Kinematic Offset Stem Implant are not prior art to the '313 patent. Finally, Zimmer argues that, to the extent any of Howmedica's sources are prior art, that the '313 patent is not invalidated because it is not anticipated by the Loda patent or Koch application.

## III. PATENTS AT ISSUE

### A. The '313 Patent and Claim Construction

Zimmer is the assignee of U.S. Patent No. 5,290,313 ("the '313 patent"). Mark A. Heldreth filed the '313 patent with the United States Patent and Trademark Office ("USPTO") on November 23, 1992, and the patent issued on March 1, 1994. The '313 patent is directed to a modular system for surgically-implanted prosthetic joints and covers an offset prosthetic stem extension. The '313 patent describes a modular implant system that replaces hu-

---

1. The Federal Circuit construed certain claim terms but declined to construe other claim terms which may have been in dispute at the time of summary judgment. Additionally, the Federal Circuit declined to determine whether the claims of the '313 patent are infringed by Howmedica's Duracon Total Stabilizer Revision System ("the Duracon system") and the Scorpio Single Axis Total Knee System ("the Scorpio system"). Instead, the Federal Circuit held that there existed genuine issues of material fact sufficient to preclude a grant of summary judgment of noninfringement.

2. The motions that were denied as premature include Howmedica's Renewed Motion for Summary Judgment of Invalidity of Claims 1–4, 6, 8, and 13–17 and Noninfringement of Claims 5, 7, and 9–12 of the '313 patent and Zimmer's Motion for Partial Summary Judgment on Howmedica's Defense and Counterclaim that the Greenwald Patent Anticipates or Renders Obvious the Asserted Claims of the '313 patent.

man joints and bones and was described primarily, though not exclusively, for use with prosthetic knee joints.

The '313 patent is comprised of a modular implant system wherein the base portion (10) and a stem extension (1) are joined together and inserted into a bone. The base portion is comprised of a base mounting means (12), and the stem extension is comprised of a stem mounting portion (2) and an elongated stem portion (3). These are joined by the connection portion (4). '313 patent, col. 2, ll. 50—col. 3, ll. 9. This base portion is then attached to the stem extension by mounting the base mounting portion on the stem mounting portion. The extending tapered pin (33) of the stem mounting portion mates with the corresponding tapered recess (43) of the base mounting portion in a "Morse taper." The axis of the Morse taper (A) is offset from the axis of the elongated stem portion (B) by offset (O). The substantially parallel, central longitudinal, offset axis of the '313 patent allows the elongated stem portion to be inserted into the intermedullary canal of the tibia, while allowing the base portion to remain centered relative to the resected bone surface. '313 patent, fig. 9, col. 3, ll. 9–44. During surgery, the '313 patent can be rotated around its attachment point to the base portion, allowing it to be moved relative to the stem extension and thus allowing the surgeon to achieve maximum coverage of the resected surface. However, once the desired position is selected, the stem extension is fixed with respect to the base portion. A figure of the '313 patent is reproduced below:

The '313 patent contains seventeen (17) claims. Claim 1 is an independent claim, and claims 2 through 17 are dependent upon claim 1. Claim 1 claims:

A modular prosthesis comprising a prosthetic base portion having a surface for positioning adjacent to a corresponding bone, the base portion having a base mounting means thereon, and a stem extension for insertion into a cavity in a bone, the stem extension having a stem mounting means for mounting the stem extension to the base mounting means, and the stem extension further having an elongated stem portion connected to the stem mounting means by a connection portion, and wherein the stem mounting means has a first central longitudinal axis and the elongated stem portion has a second central longitudinal axis substantially parallel to the first axis, but which is spaced apart therefrom to provide an offset there-between.

'313 patent, col. 5, ll. 17–30.

The Federal Circuit held that there is no radial adjustment requirement in claim

1. *Zimmer, Inc. v. Howmedica Osteonics Corp.*, 111 Fed.Appx. 593, 600 (Fed.Cir. 2004). The Federal Circuit construed the terms "modular prosthesis system" and "stem extension" to mean a standardized prosthesis system which encompassed both one-piece and multiple-piece stem extensions.[3] *Id.* at 599–600. On remand, this Court accepted Zimmer's argument that the Federal Circuit only partially construed the term "stem extension" and further construed that term ["stem extension"] as requiring "a standardized prosthesis system including a prosthetic base portion ... and a stem extension, that are located on the same side of a joint." *Zimmer Technology, Inc. v. Howmedica Osteonics Corp.*, 397 F.Supp.2d 974, 984–85 (N.D.Ind.2005).

"Stem mounting means is a means plus function limitation such that the limitation covers the embodiments disclosed in the specification that perform this function and their equivalents." *Zimmer*, 111 Fed. Appx. at 600. The Federal Circuit held that the claimed function is "mounting" and stated that the disclosed structure for performing this function is a Morse taper.[4] On remand, this Court construed the term "mounting" as "a Morse taper or equivalent structures capable of performing the claimed function of mounting the stem extension to the base." *Zimmer*, 397 F.Supp.2d at 987.

Claim 2 requires that the stem mounting means be radially adjustable in cooperation with the base mounting means to permit the second axis of the stem to be oriented in a plurality of radial orientations relative to the first axis.

Claim 3 is dependent upon claim 2 and claims: "[t]he system of claim 2 wherein the stem extension is releasably fixed to the base portion in the selected orientation." '313 patent, col. 5, ll. 36–38. The Federal Circuit construed the term "releasably fixed to the base portion" as requiring that the connection between the base portion and stem extension "be releasable after the surgeon has selected the desired position for the stem extension axis, which occurs during surgery." *Zimmer*, 111 Fed.Appx. at 602. On remand, this Court noted that, in this context, mounting or fixing was previously construed in claim 1 as "putting in position for use." To effectuate consistency between terms, this Court construed "releasably fixed" as "releasably fixed to the base portion in the selected orientation."

Claim 4 requires that the connecting portion include a lower transition surface that crosses the first axis.

Claim 6 requires that this lower transition surface cross the first axis at an angle between 5 and 90 degrees.

Claim 8 claims: "[t]he system of claim 1 wherein the base mounting means includes a recess therein, and wherein the stem mounting means includes an extending pin for mating with the recess." '313 patent, col. 6, ll. 1–4. In construing the "stem mounting means" of claim 1, the Federal Circuit stated that the disclosed structure for performing the mounting function is the Morse taper. The specification states that a Morse taper includes an extending pin and a recess. '313 patent, col. 3, ll. 45–50. The base mounting means must in-

---

**3.** The Court reasoned that if " 'modular' meant 'one piece,' claim 1 would exclude the prosthesis system of the preferred embodiments disclosed in the specification because the prosthesis systems shown in the figures include two pieces—the stem extension and the base portion." *Zimmer*, 111 Fed.Appx. at 599.

**4.** The Federal Circuit concluded that there was "sufficient evidence to raise a genuine issue of material fact as to whether the Morse taper and threaded connections are equivalent structures for the purpose of literal infringement of claim 1 under section 112, paragraph 6." *Zimmer*, 111 Fed.Appx. at 601.

clude a recess therein, and the stem mounting means must include an extending pin for mating with the recess. '313 patent, col. 3, ll. 45–48. This Court construed "extending pin" as the "male component of a Morse taper" and "recess" as the "female component of a Morse taper." *Zimmer,* 397 F.Supp.2d at 989.

Claim 13 requires that the system be comprised of a plurality of base and stem extensions, each of varying sizes, but designed so that any base could be attached to any stem.

Claim 14 requires that the stem extensions be sized to provide a plurality of offsets by varying the distance between the first and second axes.

Claim 17 claims: "[t]he system of claim 1 wherein the stem mounting means is selectively positionable in a plurality of orientations with respect to the base mounting means so that the second axis can be selectively oriented in a plurality of positions with respect to the first axis and with respect to the base portion."[5] '313 patent, col. 6, ll. 43–48. This Court construed "selectively positionable" as requiring "that the stem be capable of being positioned or arranged in any desired orientation." *Zimmer,* 397 F.Supp.2d at 990.

## B. The '920 Patent

The application for U.S. Patent No. 5,782,920 ("the '920 patent") was filed with the USPTO on November 14, 1996. The '920 patent issued on July 21, 1998, after the '313 patent issued. Howmedica manufactures the Duracon Total Stabilizer ("Duracon") and the Scorpio TS ("Scorpio") as a licensed user of the '920 patent. The Duracon and Scorpio products include "orthopedic prosthesis components for use in revision knee surgery." Howmedica's Memorandum in Support of its January 24, 2006 Motion for Summary Judgment at 7.

The '920 patent describes a system that includes a base portion/tray element (12) that is joined to an elongated stem portion (14). Before assembly, the adapter element (16) is separate from the stem portion, and it is attached to the elongated stem portion by a threaded connection. The base portion (12) is then attached to the connection portion by a second threaded connection rather than by a Morse taper. It is directed to:

> a joint prosthesis component system allows an inferior component of a prosthesis system to be offset from a superior component of the system. In one embodiment the joint prosthesis component system comprises a tibial tray having an offset tibial stem. An adapter element connects between the tibial tray and tibial stem to provide the desired degree of offset and the orientation of the offset. The adapter element is constructed such that a longitudinal axis extending through a first end thereof is offset from a longitudinal axis extending through a second end thereof.

'920 patent Abstract. A figure of the '920 patent is reproduced below:

---

5. Claim 17 requires that the user be able to select a position of the stem mounting means in a plurality of orientations relative to the base mounting means so that the second longitudinal axis may be oriented in a plurality of positions with respect to the first axis and the base portion. '313 patent, col. 6, ll. 43–48.

FIG. 2

## C. Alleged Prior Art

### 1. The Loda Patent

French Patent No. FR 2,669,214 ("the Loda patent") was issued to Loda Antonio Guillermo. The Loda patent describes an adjustable wrist prosthesis wherein a total wrist prosthesis is implanted in the bones of the radius and carpals of the hand and forearm. Loda Patent Abstract. The Loda patent describes:

An adjustable total wrist prosthesis, of a type which includes a first shaft fixed to the radius by an adequate procedure, and at least one second shaft fixed to one of the metacarpals, said first shaft and said at least one second shaft being connected to each other by a joint, characterized in that said joint consists of: a guide (7) and a slide (9), said guide (7) being mounted on a means of support and axial adjustment (4, 5, 6; 4', 5', 6', 13, 14, 15, 17), which is eccentric with regard to the axis of said first shaft (1), said means of support and adjustment being associated with a base (3) placed on the free end of said first shaft, and said slide (9) being mounted to move freely within said guide (7) and holding at least one second shaft (10) fixed on its distal part.

Total wrist prosthesis according to claim 1, characterized in that said means of support includes a threaded pin (6) which screws into a female thread (5) formed in a cylindrical body (4) fixed on said base.

Loda Patent Abstract. Figures 2, 3, and 4 from the Loda patent are reproduced below:

FIG. 2

FIG. 3

FIG. 4

## 2. The Koch Application

European Patent Application No. 0 290 735 ("the Koch application") was submitted on March 3, 1988 and was invented by Rudolf Koch and Otto Frey. The date of laying open of the application was November 17, 1988. The Koch "invention concerns a kit for construction of a femur head prosthesis during surgery, which can be composed of a proximal neck part, which holds the joint head, a middle part and a distal end part, where the different parts are joined together through cone plug-in connections, in which the father cone and the mother cone always have the same conicity, characterized by the fact that the middle part is designed as a central shaft body (2), which has proximally and distally protruding father cones (4, 5) onto which the neck part (8) and the end

part (17, 18) can be attached and secured." Koch Patent Application at 5. The Koch application describes:

> The kit for the anchoring shaft (1) of a femur head prosthesis consists of a shaft body (2), a neck part (8) and an end part (17). Neck part (8) and end part (17) can be attached to the shaft body (2) through its father cone (4, 5), which extends almost along the entire shaft length and provides stability and strength.
>
> The distal end part (17), separated from the shaft body (2), makes adaptation of the shaft to an individual patent possible during surgery, even in the distal region, without having to exchange the "main part" of the shaft, which determines stability and strength.

Koch Application at 1. Figures of the Koch Application are reproduced below: [6]

**6.** Figure 1 shows a ventral-dorsal view of the kit shaft for a femur head prosthesis, partially in cross-section. Figures 2 and 3 are sections II–II and III–III of Figure 1, and Figure 4 depicts the distal end of a second embodiment of the invention. *See* Koch Application at 4.

0 290 735

Fig. 1

Fig. 2

Fig. 4

Fig. 3

## 3. Howmedica Kinematic Offset Stem Implant

In 1991, Howmedica designed and manufactured a custom knee implant entitled the Howmedica Kinematic Offset Stem Implant. The Howmedica Kinematic Offset Stem Implant is a customized orthopedic implant ordered by a surgeon to fit a

particular patient's autonomy. The Howmedica Kinematic Offset Stem Implant depicted below "shows an offset unitary stem and base for implantation into a patient's tibia in a total knee replacement surgery." Laskin Rep. at 21.

The offset stem implant depicted above shows a stem extension having two central parallel axes that are longitudinally offset. "Prior to implantation, an articulating insert is mounted on the proximal end of the offset stem/base, with a femoral component disposed on the opposing side of the joint." Laskin Rep. at 21.

## IV. STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if there is no genuine issue as to any material fact, the trial court has properly construed the claims, and the moving party is entitled to judgment as a matter of law. *Lockwood v. American Airlines Inc.*, 107 F.3d 1565, 1576 (Fed. Cir.1997). *See also Nebraska v. Wyoming*, 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *NUCOR Corp. v. Aceros Y Maquilas de Occidente*, 28 F.3d 572, 583 (7th Cir.1994).

The moving party bears the burden of identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" that the moving party believes demonstrate an absence of genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once this burden is met, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e); *Becker v. Tenenbaum–Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir.1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir.1989). "[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir.1988). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment is proper.

## V. DISCUSSION

Zimmer raises three main arguments in its motion for partial summary judgment: (1) that the Loda patent and Koch application cannot anticipate any claim of the '313 patent for which Howmedica has offered no evidence of anticipation; (2) that the

Loda patent and the Howmedica Kinematic Offset Stem Implant are not "prior art" to the '313 patent and thus cannot anticipate or render obvious any asserted claim of the '313 patent; and (3) that the Loda patent and Koch application cannot anticipate any asserted claim of the '313 patent.

## A. Whether the Loda Patent and Koch Application Anticipate any Claim of the '313 Patent for which Howmedica has Offered No Evidence of Anticipation

Zimmer asserts that it is entitled to summary judgment that the Koch application does not anticipate claims 2 or 15–17 of the '313 patent. Docket No. 211 at 1. Zimmer also asserts that the Loda patent does not anticipate or render obvious claims 8 or 9 of the '313 patent, and the Loda patent does not anticipate claims 15–17 of the '313 patent. *Id.* Instead of offering substantive responses to Zimmer's summary judgment arguments on the invalidity issues outlined above, Howmedica merely states that it is has never asserted those invalidity arguments and that they should, accordingly, be denied as moot.

■ In *Civix–DDI, LLC v. Cellco P'ship*, 387 F.Supp.2d 869, 881 (N.D.Ill. 2005), the court held that it is improper for a court to grant summary judgment on an issue that a party is no longer asserting because, to do so, would result in an improper advisory opinion. Summary judgment on these issues is inappropriate because such would merely be an academic exercise resulting in an advisory opinion; the appropriate response is to deny these issues as moot. *Id.* The same reasoning applies to issues that a party has never before asserted. Therefore, Zimmer's motions for summary judgment that the Koch application does not anticipate claims 2 or 15–17 of the '313 patent, the Loda patent does not anticipate or render obvious

claims 8 or 9 of the '313 patent, and the Loda patent does not anticipate claims 15–17 of the '313 patent are denied as moot.

## B. Whether the Loda Patent and the Howmedica Kinematic Offset Stem Implant are "Prior Art" to the '313 Patent

■ Before the Court can analyze whether the Loda patent or Howmedica Kinematic Offset Stem Implant anticipate the '313 patent, it must determine whether each qualifies as prior art under 35 U.S.C. § 102.[7] A patent is invalid under 35 U.S.C. § 102 when "a prior art reference disclose[s] every limitation of the claimed invention, either explicitly or inherently." *In re Schreiber*, 128 F.3d 1473, 1477 (Fed. Cir.1997). That the reference or product is prior art to the '313 patent must be demonstrated by clear and convincing evidence. *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1157 (Fed. Cir.2004). Whether a reference is prior art is a question of law based on underlying factual considerations. *Id.; Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1330 (Fed.Cir.2004); *Dow Chem. Co. v. Mee Indus.*, 341 F.3d 1370, 1375 (Fed.Cir.2003).

### 1. *The Loda Patent*

Zimmer contends that it is entitled to summary judgment on the claim that the Loda patent is not prior art to Zimmer's '313 patent under 35 U.S.C. §§ 102(a) or (b). Zimmer further contends that if the Loda patent is not prior art to the '313 patent, the Loda patent cannot invalidate the '313 patent alone or in combination. This Court will address sections 102(a) and 102(b) in turn.

#### a. *Section 102(a)*

Zimmer maintains that the Loda patent is not § 102(a) prior art because the prior

7. Only 35 U.S.C. §§ 102(a) and 102(b) are at issue in this case.

art date of the Loda patent is May 24, 1995 and the invention date of the '313 patent is no later than November 23, 1992, the filing date of the '313 patent application. Docket No. 212 at 7. Because May 24, 1995 is after November 23, 1992, Zimmer argues that the Loda patent cannot be prior art under § 102(a).

Howmedica contrarily asserts that "Zimmer improperly focuses solely on the *patent* date of the Loda reference, May 24, 1995, while completely ignoring the *publication* date of the application, **May 22, 1992.**" Docket No. 259–1 at 11 (emphasis in original). According to Howmedica, when a reference was "patented" and when it was "published" are two separate inquiries and "two completely separate bases under which a reference may constitute prior art." Docket No. 259–1 at 12. Because the Loda patent was published before the '313 patent was filed, Howmedica contends that the Loda patent is *prima facie* prior art to the '313 patent. Docket No. 259–1 at 13.

■■■ Section 102 states that "a person shall be entitled to a patent unless (a) the invention was known or used by others in this country, or *patented or described in a printed publication in this or a foreign country,* before the invention thereof by the applicant for patent." 35 U.S.C. § 102(a) (emphasis added). For purposes of § 102(a), a patent is initially presumed by law to have been invented on its filing date. *Ecolochem, Inc. v. Southern Cal. Edison Co.,* 227 F.3d 1361, 1371 (Fed.Cir. 2000). Section 102(a) contains a requirement that a foreign patent be disclosed in order to qualify as prior art under this section. "The requirement, however, is only that the patent be available to the public." *In re Carlson,* 983 F.2d 1032, 1035 (Fed.Cir.1992) (internal quotations omitted). And "under section 102(a), a document is prior art only when published before the invention date." *Mahurkar v.*

*C.R. Bard, Inc.,* 79 F.3d 1572, 1576 (Fed. Cir.1996).

■■■ Here, the Loda application was filed on November 21, 1990. The date of public availability of the Loda application was May 22, 1992, and the Loda patent issued on May 24, 1995. Loda Patent Abstract; Docket No. 212, Exhibit D. Construing the facts in the light most favorable to the non-moving party, the Loda patent was patented on May 24, 1995, but was described in a printed publication in a foreign country on May 22, 1992. Since May 22, 1992 is before November 23, 1992, Zimmer is not entitled to summary judgment that the Loda patent cannot be prior art under § 102(a).

At the August 17, 2006 oral argument hearing, Zimmer asserted that it is entitled to an earlier actual invention date of August 7, 1991. Zimmer stated that if it is correct about the earlier invention date, the '313 invention date [August 7, 1991] would be approximately nine months prior to the Loda publication date [May 22, 1992]. As such, Zimmer argues that the Loda patent would not be prior art under § 102(a). This Court finds that there is a genuine issue of material fact with respect to the date of invention of the '313 patent. As such, the Court cannot find that the prior invention date of the '313 patent prevents the Loda patent from being § 102(a) prior art. *See* discussion in Section 2(a) [of this order] infra.

*b. Section 102(b)*

Zimmer asserts that the prior art date of the Loda patent must be compared to the "critical date," which is one year before the application date of the patent for purposes of § 102(b). As discussed above, Zimmer contends that the prior art date of the Loda patent is May 24, 1995. Docket No. 212 at 7. Zimmer argues that "[b]ecause the application for the '313 patent

was filed on November 23, 1992, the § 102(b) critical date is November 23, 1991." Docket No. 212 at 7. As such, Zimmer maintains that because May 24, 1995 is after November 23, 1991, the Loda patent cannot be prior art under § 102(b). Docket No. 212 at 7.

■ Howmedica failed to present any argument to this Court in response to Zimmer's claim that it is entitled to summary judgment that the Loda patent is not prior art under § 102(b). Accordingly, Howmedica abandoned that claim, and partial summary judgment is granted in Zimmer's favor on this issue. *See Palmer v. Marion County*, 327 F.3d 588, 597–98 (7th Cir.2003) (claim not delineated in summary judgment opposition brief is deemed abandoned); *Medley v. City of Milwaukee*, 969 F.2d 312, 317 (7th Cir.1992) (arguments not presented to the district court in response to summary judgment motions are waived).

### 2. *Howmedica Custom Implant*

Zimmer contends that it is entitled to summary judgment that the Howmedica Kinematic Offset Stem Implant, Laskin Exhibit G, is not prior art under §§ 102(a) and (b) and cannot anticipate or be considered as part of an obviousness analysis as a matter of law. Docket No. 212 at 8. Howmedica argues that the '313 patent is invalid because it would have been obvious in view of the Howmedica Kinematic Offset Stem Implant. Docket No. 259–1 at 3. This Court will again address sections 102(a) and 102(b) in turn.

#### a. *Section 102(a)*

The '313 patent was filed on November 23, 1992. As a matter of law, the date of invention of the '313 patent is no later than that date. However, Zimmer asserts that it is entitled to an invention date before the filing date of the '313 patent application because an earlier actual inven-

tion date exists. Docket No. 212 at 8. Zimmer asserts that the patent inventor, Mark Heldreth ("Heldreth"), "conceived the invention of the '313 patent no later than July 15, 1991 and reduced the invention to practice no later than August 7, 1991." Docket No. 212 at 9; citing Heldreth Dep. at 20:23–21:13. To support this contention, Zimmer asserts that the July 15, 1991 conception date is corroborated in Heldreth's laboratory notebook in an entry identifying the idea that allegedly resulted in the '313 patent on July 17, 1991. Docket No. 212 at 9. Zimmer claims that Mr. Bob Hodorek ("Hodorek") witnessed Heldreth's July 15, 1991 entry. Docket No. 212 at 9 (citing ZIM003780–81, Patmore Decl. Ex. A and Hodorek Decl Ex. A; Heldreth Dep. at 30:23–31:7 & Ex. 4). Zimmer argues that immediately after conception, the '313 patent idea was reduced to practice through prototyping. According to Zimmer, its development documents "state that on August 7 [1991] prototypes were presented at a development team meeting and approved by surgeons working with Zimmer." Docket No. 212 at 9. Zimmer contends that because the '313 patent invention had been conceived and reduced to practice by August 7, 1991, the date of invention is no later than August 7, 1991. Docket No. 212 at 9.

For the Howmedica Kinematic Offset Stem Implant to qualify as prior art under § 102(a), it must have been "on sale" before the date of invention of the '313 patent. Docket No. 212 at 9. Zimmer maintains that the design of the Howmedica Kinematic Offset Stem Implant design was not prepared and presented to Dr. Encker, a surgeon, until November 27, 1991. Accordingly, Zimmer asserts that November 27, 1991 is the earliest date that Howmedica's Custom Implant could have been on sale. Because November 27, 1991 is after August 7, 1991, Zimmer asserts that the Howmedica Custom Implant cannot be pri-

or art under § 102(a) as a matter of law. Docket No. 212 at 10.

In response, Howmedica failed to specifically address the issue of whether the '313 patent was conceived and reduced to practice prior to the date of sale of the Howmedica Kinematic Offset Stem Implant, but did present some analysis regarding conception and reduction to practice in its discussion of the Loda application. In the interest of thoroughness, this Court will address this issue rather than summarily granting the motion.

■ Howmedica argues that Zimmer cites to a handful of laboratory notebook pages to establish that the '313 patent was conceived on July 17, 1991, but Zimmer fails to establish the admissibility or authenticity of those laboratory notebook pages. According to Howmedica, Heldreth's deposition testimony and the declaration of Audrey Patmore ("Patmore") do not establish admissibility or authenticity. Docket No. 259–1 at 13. Howmedica contends that Patmore's "declaration is insufficient because she does not have any personal knowledge regarding this document, its contents, or its accuracy. . . . Ms. Patmore was not involved in the alleged conception or reduction to practice of the '313 patent." Docket No. 259–1 at 13. Further, Howmedica contends that the laboratory notebook does not evidence conception of the alleged claimed inventions of the '313 patent because it does not evidence conception of all of the limitations of independent claim, 1 as well as all of the limitations of the dependent claims.[8] Docket No. 259–1 at 13–14.

Howmedica also argues that Zimmer has failed to provide evidence of timely reduction to practice with associated dili-

gence. Docket No. 259–1 at 14. Howmedica stated that the document allegedly presented to and approved by surgeons as a prototype for the '313 patent is a single document that "does not provide *any* drawings or blueprints, and only vaguely and generally describes the offset stem." Docket No. 259–1 at 15 (emphasis in original). According to Howmedica, "[i]t is entirely unclear from this document what the prototype looked like, i.e., there is no evidence that the offset stem prototype was that allegedly conceived by Mr. Heldreth or that it provided two substantially parallel longitudinally offset central axes." Docket No. 259–1 at 15. Howmedica asserts that the reduction to practice and prototyping cannot be supported by Heldreth's deposition because Heldreth testified that he did not remember the date of reduction to practice and does not recall the circumstances of any prototyping.

Howmedica also argues that Patmore's declaration is insufficient to establish the authenticity or admissibility of Heldreth's laboratory notebook because she did not have personal knowledge of the date of reduction to practice or the surrounding circumstances. Howmedica further asserts that Zimmer "provided no evidence of diligence during the 16 months between its alleged conception date and the filing of the patent." Docket No. 259–1 at 16. Because Zimmer's evidence of conception, reduction to practice, or diligence between the alleged conception date and filing date are insufficient, Howmedica argues that the only date on which Zimmer can rely for invention is November 23, 1992. Docket No. 259–1 at 14 and 16.

■ An invention occurs when there has been both conception and reduction to

8. Specifically, Howmedica alleges that the none of the documents Zimmer cited refer to the "modular prosthesis system" required in claim 1 and that the limitations of claims 13 and 14 are not disclosed. Docket No. 259–1 at 21.

practice. *Mahurkar,* 79 F.3d at 1577–78. Priority of invention goes to the "first party to reduce an invention to practice unless the other party can show that it was the first to conceive of the invention and that it exercised reasonable diligence in later reducing that invention to practice." *Cooper v. Goldfarb,* 154 F.3d 1321, 1327 (Fed.Cir.1998). Priority, conception, and reduction to practice are questions of law to be determined based upon underlying factual determinations. *Price v. Symsek,* 988 F.2d 1187, 1190 (Fed.Cir.1993).

■ "Conception is the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice." *Brown v. Barbacid,* 276 F.3d 1327, 1335–1336 (Fed.Cir.2002) (internal quotations omitted). All limitations of the claimed invention must be encompassed, and conception "is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." *Burroughs Wellcome Co. v. Barr Lab., Inc.,* 40 F.3d 1223, 1228 (Fed.Cir.1994). Conception, then, requires "both (1) the idea of the invention's structure and (2) possession of an operative method of making it." *Invitrogen Corp. v. Clontech Laboratories, Inc.,* 429 F.3d 1052, 1063 (Fed.Cir.2005). Conception requires that the inventor appreciate the fact of what he has invented. *Id. (citing Dow Chem. Co. v. Astro–Valcour, Inc.,* 267 F.3d 1334, 1341 (Fed.Cir.2001)).

■ A reduction to practice may be either constructive or actual. *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1376 (Fed.Cir.1986). Constructive reduction to practice occurs when the patent application is filed. *Cooper,* 154 F.3d at 1327. To establish actual reduction to practice, the inventor must prove that (1) there was a physical embodiment which includes all limitations of the claim and (2) that the invention will work for its intended purpose. *See, Estee Lauder Inc. v. L'Oreal S.A.,* 129 F.3d 588, 593 (Fed. Cir.1997). Once the invention has been shown to work for its intended purpose, "[f]urther efforts to commercialize the invention are simply not relevant to determining whether a reference qualifies as prior art against the patented invention." *Loral Fairchild Corp. v. Matsushita Elec.,* 266 F.3d 1358, 1363 (Fed.Cir.2001).

■ The inventor's testimony must be corroborated by independent evidence to establish a reduction to practice. *Cooper,* 154 F.3d at 1330. *See, Price,* 988 F.2d at 1194 (an inventor must prove his conception with more than his own testimony respecting the facts surrounding a claim of derivation or priority of invention). The "credibility (and therefore the corroborative value) of an inventor's notebook may vary." *Medichem S.A. v. Rolabo, S.L.,* 437 F.3d 1157, 1170 (Fed.Cir.2006). The corroboration requirement rests upon credibility determinations in an effort to prevent fraud. It "provides an additional safeguard against courts being deceived by inventors who may be tempted to mischaracterize the events of the past through their testimony." *Medichem,* 437 F.3d at 1170.

To determine whether the inventor's testimony has been sufficiently corroborated, the Court must employ a "rule of reason" analysis in which all pertinent evidence is evaluated to reach "a sound determination of the credibility of the [alleged] inventor's story." *Trovan, Ltd. v. Sokymat SA, Inc.,* 299 F.3d 1292, 1302 (Fed.Cir.2002) (*quoting Price,* 988 F.2d at 1195). *See Loral Fairchild Corp.,* 266 F.3d at 1363. Independent knowledge is central to the corroboration inquiry. *Medichem,* 437 F.3d at 1170. "Independent corroboration may consist of testimo-

ny of witnesses, other than the inventor, to the actual reduction to practice or it may consist of evidence of surrounding facts and circumstances independent of information received from the inventor." *Reese v. Hurst,* 661 F.2d 1222, 1225 (Cust. & Pat.App.1981). All pertinent evident must be evaluated "when determining the credibility of an inventor's testimony … [but] it is not necessary to produce an actual over-the-shoulder observer. Rather, sufficient circumstantial evidence of an independent nature can satisfy the corroboration requirement." *Cooper,* 154 F.3d at 1330.

To support the August 7, 1991 invention date, Zimmer relies on Heldreth's testimony, his laboratory notebook, Hodorek's testimony corroborating the laboratory notebook, and the minutes of an August 7, 1991 meeting. On close inspection, however, Zimmer's evidence fails to carry its summary judgment burden. Zimmer relies on laboratory notebook entries whose meanings are factually disputed. Zimmer contends that a July 17, 1991 entry by Heldreth that was witnessed by Hodorek on August 16, 1991, combined with the minutes of a meeting on August 7, 1991 regarding the Next Generation Knee Fixation and Sizing, provide undisputed evidence that after the design was completed Zimmer immediately began working on prototyping it. Docket No. 212 at 9 (quoting Heldreth Dep. at 23:4–23:13). Essentially, Zimmer argues that the entries in Heldreth's laboratory notebook demonstrate to a person skilled in the art that Heldreth conceived all of the limitations of independent claim 1 of the '313 patent as well as all of the dependent claims no later than August 7, 1991. Zimmer asserts that its development documents corroborate this fact by showing that prototypes were passed out at the August 7, 1991 meeting. ▮ Zimmer fails to provide this Court with expert testimony that properly ex-

plains the technical notebook entries advanced in support of its conception and diligence in reduction to practice arguments. "Unsubstantiated attorney argument regarding the meaning of technical evidence is no substitute for competent, substantiated expert testimony." *Invitrogen Corp. v. Clontech Laboratories, Inc.,* 429 F.3d 1052, 1068 (Fed.Cir.2005). Zimmer fails to point to expert testimony explaining the scope and meaning of Heldreth's notebook entries and whether all of the claimed elements existed in Heldreth's notebook entry. Such wholly conclusory assertions on a legal issue cannot carry Zimmer's burden on summary judgment. *See Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.,* 249 F.3d 1341, 1353 (Fed.Cir.2001).

There also exist genuine issues of material fact regarding whether, on August 7, 1991, Heldreth conceived of the construction of an embodiment or performance of a process that met all of the limitations of the '313 invention and whether the invention would work for its intended purpose. To be admissible as evidence, Fed.R.Civ.P. 56(e) declarations in support of summary judgment motion must be based on personal knowledge. Howmedica has proffered evidence raising genuine issues of dispute as to the conception and reasonable diligence in reduction to practice of the '313 patent. This Court finds that there is a genuine issue of material fact as to whether Patmore had personal knowledge of the conception of the '313 patent. There is also a material factual dispute as to whether the conception described in the laboratory notebook and discussed at the August 7, 1991 meeting encompassed all of the limitations of the claimed invention; specifically, Howmedica has raised genuine issues of material fact with regard to claims 1, 13, and 14.

Because the Court finds that there is a material factual dispute with respect to the date of conception, the Court declines to address whether Zimmer's reduction to practice was reasonable. The diligence inquiry revolves around whether a party exercised reasonable diligence, and reasonableness determinations are best left for the trier of fact. Accordingly, Zimmer's motion for partial summary judgment on this issue is denied.

*b. Section 102(b)*

Zimmer also contends that it is entitled to summary judgment that the Howmedica Kinematic Offset Stem Implant is prior art under § 102(b). Section 102 states that "a person shall be entitled to a patent unless (b) the invention patented or described in a printed publication in this or a foreign country or *in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.*" 35 U.S.C. § 102(b) (emphasis added). "If a device was in public use or on sale before the critical date, then that device becomes a reference under section 103 against the claimed invention." *Baker Oil Tools, Inc. v. Geo Vann, Inc.,* 828 F.2d 1558, 1563 (Fed.Cir.1987) (citations omitted). The "critical date" is the date one year prior to the application date of the patent for purposes of § 102(b). Therefore, to qualify as prior art under § 102(b), the Howmedica Custom Implant in Exhibit G must have been "on sale" before the "critical date" one year earlier. Zimmer asserts that the invention date of the '313 patent is no later than November 23, 1992, the filing date of the patent application. Docket No. 212 at 8. Consequently, the "critical date" is November 23, 1991.

■ An invention was "on sale" if the claimed invention was embodied in the thing sold or commercially offered for sale as defined under the Uniform Commercial Code. *See Pfaff v. Wells Electronics, Inc.,* 525 U.S. 55, 67, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998); *Group One, Ltd. v. Hallmark Cards, Inc.,* 254 F.3d 1041, 1047 (Fed.Cir. 2001). There is no requirement that a sale actually be made, and an offer for sale is sufficient to trigger the "on sale" bar. *See In re Caveney,* 761 F.2d 671, 676 (Fed.Cir. 1985) (a single sale or offer for sale triggers the "on sale" bar of § 102(b).) The invention must be ready for patenting at the time of sale, meaning that there must be reason to believe that the invention will work for its intended purpose. *Pfaff,* 525 U.S. at 67, 119 S.Ct. 304. In *Pfaff,* the Court held that this "condition may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Id.* Whether a product was "on sale" as required under 35 U.S.C. § 102(b) is "a question of law based upon underlying issues of fact." *Robotic Vision Sys. v. View Engineering,* 112 F.3d 1163, 1167 (Fed.Cir.1997).

■ Zimmer maintains that "there is no evidence that the Exhibit G implant was 'on sale' before November 27, 1991— after the § 102(b) critical date." Docket No. 212 at 11. Zimmer relies on a design of the Exhibit G custom implant that was presented to Dr. Enker on November 27, 1991. Exhibit C to Docket No. 212. As such, Zimmer contends that it cannot be prior art under § 102(b) as a matter of law.

In response, Howmedica asserts that "Zimmer incorrectly focuses on when the product was actually "sold," and ignores documents and evidence that establish when it was "on sale" (i.e., offered for sale) for purposes of § 102(b)." Docket No.

259–1 at 4. Howmedica argues that the Howmedica Kinematic Offset Stem Implant included an offset stem virtually identical to that described in the '313 patent and that there is a drawing dated November 20, 1991 that makes reference to the custom implant being longitudinally offset.

Moreover, Howmedica does not "allege that any specific drawing is prior art . . . . [but asserts] the product itself, as shown in the drawings, was on sale prior to the 35 U.S.C. § 102(b) bar date." Docket No. 259–1 at 3. Howmedica argues that on November 18, 1991, an orthopedic surgeon, Dr. Enker, ordered a custom stem tibial implant with a stem extension from Howmedica and that this order was "assigned an internal Howmedica tracking number: RX 11–18–91B." Docket No. 259–1 at 8 (citing Beshaw Decl. at ¶ 6). Howmedica asserts that it immediately began working on the order and that, on November 20, 1991, Beshaw sent Dr. Enker a letter and initial drawings of an implant with a straight stem extension. According to Howmedica, Dr. Enker informed Beshaw on November 22, 1991 that the requested custom implant required a longitudinal offset. Howmedica claims that on November 22, 1991, the original blueprint drawing including the straight stem was "modified in handwriting to reflect Dr. Enker's offset stem design requirements." Docket No. 259–1 at 8. Howmedica contends that on November 22, 1991, Beshaw, through a sales representative, informed Dr. Enker that Howmedica could and would make the requested custom tibial implant with offset stem extension. Docket No. 259–1 at 8 (citing Beshaw Decl. at ¶ 12). Howmedica asserts that this November 22, 1991 communication constituted a commercial offer for sale of Howmedica's Kinematic Offset Stem Implant; Howmedica maintains that it matters not that this offer for sale occurred one day prior to the critical date

under § 102(b). Docket No. 259–1 at 8 (citing Beshaw Decl. at ¶ 5–14; Ex. A to Beshaw Decl. At HM 34149–HM34183). Howmedica argues that it "is irrelevant as a matter of law that the product was paid for, approved, or delivered *after* the bar date." Docket No. 259–1 at 9.

■■ It is well established that "uncorroborated oral testimony by interested parties is insufficient as a matter of law to establish invalidity of [a] patent." *Lacks Ind., Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1350 (Fed. Cir.2003). *See also Oney v. Ratliff*, 182 F.3d 893, 896 (Fed.Cir.1999) (noting that the "uncorroborated oral testimony of . . . the inventor and his close associates would be insufficient to prove invalidity"); *Woodland Trust v. Flowertree Nursery*, 148 F.3d 1368 (Fed.Cir.1998) (outlining eight factors for evaluating the credibility of an interested witness). The Federal Circuit has also extended the corroboration requirement to uninterested witnesses. *See, Finnigan Corp. v. International Trade Comm'n*, 180 F.3d 1354, 1367 (Fed.Cir. 1999) (holding that any witness whose testimony alone is asserted to invalidate a patent must be corroborated).

Here, Howmedica set forth the declaration of Debbie Beshaw to demonstrate that the Howmedica Kinematic Offset Stem Implant was the subject of a "commercial offer for sale" and "ready for patenting" before the "critical date" of November 23, 1991. Beshaw testified that on November 22, 1991, Dr. Enker provided his complete requirements and specifications, including a requirement that the stem extension include offset longitudinal axes. Beshaw Decl. at 3. Based on her personal recollection, Beshaw stated that the Howmedica Kinematic Offset Stem Implant was orally offered for sale to Dr. Enker on November 22, 1991 and that, thereafter, she sent Dr.

Enker revised blueprints, made the product, and delivered the product.

This Court finds that Beshaw's oral testimony alone is an insufficient basis on which the '313 patent may be invalidated. This is not to say that Beshaw's testimony is incredible, but simply that such evidence alone cannot surmount the hurdle that the clear and convincing standard imposes in proving patent invalidity. *Mahurkar*, 79 F.3d at 1577. Beshaw's testimony came more than fourteen years after the alleged offer for sale of the Howmedica Kinematic Offset Stem Implant. Because of her status as at least a former Howmedica employee,[9] this Court cannot find her testimony to be disinterested.

The drawings proffered to corroborate her oral testimony are also inadequate to meet the applicable standard of proof. Those physical records that were made contemporaneously with the alleged prior invention do not corroborate Beshaw's testimony regarding the alleged prior offer for sale. Documents HM 25867, HM 34150–54, HM 34151, are dated as prepared on November 27, 1991. *See* Exhibit C to Docket No. 212. Thus, Howmedica's own documents do not corroborate Beshaw's testimony that the Howmedica Kinematic Offset Stem Implant was effectually redesigned and orally offered for sale to Dr. Enker on November 22, 1991. Beshaw's testimony alone is, therefore, not a sufficient basis on which the Court may rely to determine whether the Howmedica Kinematic Offset Stem Extension was on sale before the "critical date"—November 23, 1991. Accordingly, Howmedica has failed to demonstrate that there exists a genuine issue of material fact. The Court finds that the Howmedica Kinematic Offset Stem Extension does not qualify as a prior art reference to the '313 patent under § 102(b) and grants Zimmer's motion for summary judgment on this issue.

## C. Validity of the '313 Patent.

Zimmer moved for partial summary judgment on Howmedica's invalidity defense, arguing that neither the Loda patent nor the Koch application anticipate any asserted claim of the '313 patent. Determining validity is a two-step process: (1) the Court must properly construe the claims and (2) the Court must compare the construed claims to the prior art. *Helifix Ltd. v. Blok–Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed.Cir.2000). This Court entered a final claim construction order on October 12, 2005 and has, accordingly, completed step one of this process. Now, this Court must complete step two by comparing the construed claims of the '313 patent to the Loda patent and Koch application.

 A patent shall be presumed valid, and each claim of a patent, whether it is in independent, dependent, or multiple dependent form, shall be presumed valid independently of the validity of other claims. 35 U.S.C. § 282; *Superior Fireplace Co. v. Majestic Prods. Co.*, 270 F.3d 1358, 1367 (Fed.Cir.2001). The presumption of validity can be overcome only through clear and convincing evidence of invalidity. *Impax Laboratories, Inc. v. Aventis Pharmaceuticals, Inc.*, 468 F.3d 1366, 1378 (Fed.Cir.2006); *TypeRight Keyboard Corp.*, 374 F.3d at 1157; *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1563 (Fed.Cir.1997). Alterna-

9. As of February 23, 2006—the date of her declaration—Debbie Beshaw stated that she was a Project Planner/Mfg. Engineer for the Custom Implants Department at Stryker Orthopedics. In 1991, she worked as a product development engineer in the special orthopaedic services department at Howmedica. Docket No. 261 (Beshaw Decl.) at 1. This Court notes, however, that at the August 17, 2006 motions hearing in South Bend, Indiana, Mr. Hales stated that Debbie Beshaw "is a Howmedica employee—was then and still is now I believe ..." Transcript of 8/17/06 Oral Argument at 50.

tively, "[a] moving party seeking to have a patent held not invalid at summary judgment must show that the nonmoving party, who bears the burden of proof at trial, failed to produce clear and convincing evidence on an essential element of a defense upon which a reasonable jury could invalidate the patent." *Eli Lilly and Co. v. Barr Laboratories, Inc.*, 251 F.3d 955, 962–63 (Fed.Cir.2001).

Anticipation is a question of fact, but it may be decided on summary judgment where there are no genuine disputes as to whether the limitations of the claimed invention are disclosed by the prior art reference(s). *Minnesota Mining & Mfg. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir.2002); *Hazani v. U.S. Intern. Trade Com'n*, 126 F.3d 1473, 1477 (Fed.Cir.1997). *See Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1346 (Fed.Cir.1999) (stating when considering a question of anticipation, the scope and content of the prior art and what it teaches are questions of fact). In determining whether a genuine issue of material fact exists, this Court must view the evidence in the light most favorable to the nonmoving party and resolve all doubts in its favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

 Under 35 U.S.C. § 102, each and every element of the claimed invention must be disclosed, either expressly or inherently, in a single prior art reference to invalidate a patent by anticipation.[10] *Teleflex, Inc. v. Ficosa North Am. Corp.*, 299 F.3d 1313, 1335 (Fed.Cir.2002); *Bristol–Myers Squibb Co. v. Ben Venue Labs.*, 246 F.3d 1368, 1373 (Fed.Cir.2001); *Atlas*

*Powder Co.*, 190 F.3d at 1346. The invention must be new or novel, and a challenger cannot prove anticipation "by combining more than one reference to show the elements of the claimed invention." I DONALD S. CHISUM, CHISUM ON PATENTS § 3.02 (Rel. No. 71, Sept. 1999). If any claimed element is missing from this single prior art reference, it cannot anticipate the claimed invention. *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1349 (Fed.Cir.1998). A prior art reference may anticipate when "the claim limitation or limitations not expressly found in that reference are nonetheless inherent in it."[11] *Atlas Powder Co.*, 190 F.3d at 1347. Inherency in a prior art reference is established when the claim feature is the " 'natural result' flowing from the reference's explicitly explicated limitations." *Eli Lilly and Co.*, 251 F.3d at 970 (*citing Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1269 (Fed.Cir.1991)). To prevail on this summary judgment motion, Zimmer must show that the nonmoving party, Howmedica, has failed to produce clear and convincing evidence that either the Loda patent or the Koch application anticipate the '313 patent.

### 1. The Loda Patent

Zimmer moved for summary judgment, asserting that the Loda patent cannot anticipate any asserted claim of the '313 patent because the Loda Patent does not disclose (1) a modular prosthesis system, (2) a base portion and a stem extension that are on the same side of a joint, or (3)

---

10. Anticipation requires that "the four corners of a single, prior art document describe every element of the claimed invention, expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Systems, Inc. v. Kent State University*, 212 F.3d 1272, 1282 (Fed.Cir. 2000).

11. Whether a claim limitation is inherent is a question of fact. *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1380 (Fed. Cir.2005); *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1220 (Fed.Cir.2003).

the claimed stem extension for insertion into a cavity in a bone. The Court will address each of these contentions individually.

### a. *Modular Limitation:*

Claim 1 of the '313 patent claims "a modular prosthesis comprising a prosthetic base portion having a surface for positioning adjacent to a corresponding bone, the base portion having a base mounting means thereon, and a stem extension for insertion into a cavity in a bone ..." The Federal Circuit construed "modular prosthesis system" to mean a standardized prosthesis system encompassing both one-piece and multiple-piece stem extensions. *Zimmer*, 111 Fed.Appx. at 600. To anticipate claim 1 of the '313 patent, the Loda patent must also disclose the same modular prosthesis system.

Zimmer argues that the Loda patent fails to disclose "modular" components or even mention the concept of modularity, in direct contravention of this Court's construction of that term. Zimmer acknowledged Dr. Laskin's opinion that "one of ordinary skill in the art would have explicitly or inherently understood that the Loda wrist system should be utilized with modular components." Laskin Report at 27–28. However, according to Zimmer, Dr. Laskin did "not opine that Loda discloses modular components." Docket No. 212 at 13. On that basis, Zimmer contends that the Loda patent cannot explicitly anticipate the modular limitation.

While Howmedica seemingly concedes that the Loda patent does not explicitly anticipate the modular limitation of the '313 patent, Howmedica does assert that the Loda patent inherently discloses such a modular prosthesis system. According to Howmedica, "any commercial orthopedic implant at the time the '313 patent was filed would necessarily and inevitably be a standardized prosthesis system with a va-

riety of different sizes." Docket No. 259–1 at 18 (citing Ex. A to Zim. Mem., Laskin Rep. at 27–28).

Howmedica contends that a "single sized orthopedic implant suited for only a very narrow type of patient would have no commercial use ... [and] to be commercially practicable, the Loda wrist implant would necessarily and naturally include a selection of different sizes." Docket No. 259–1 at 18–19 (citing Ex. A. to Zim. Mem., Laskin Rep. at 69–70).

Zimmer, however, disagrees. Zimmer argues that "[w]hat other manufacturers were 'moving towards,' and what might be required for a system to be 'successful,' are insufficient to establish an inherent disclosure in the Loda patent." Docket No. 212 at 14. Zimmer also noted that modularity is not "necessary" to the implant disclosed in the Loda patent and that the Loda patent can function as intended without modular components.

Zimmer has failed to present sufficient evidence to rebut Howmedica's evidence of inherency, and Howmedica's response raises sufficient issues genuine material fact regarding whether the Loda patent contains the claimed modular limitation. Howmedica points to expert testimony from Dr. Laskin stating that one of ordinary skill in the art would have at least inherently understood that the Loda wrist system should be utilized with modular components. Thus, while it is clear that the Loda patent does not explicitly disclose the modular limitation, there is competing evidence regarding whether the Loda patent inherently discloses modular components. This is a question for the jury.

### b. *Disclosure of a base portion and a stem extension that are on the same side of a joint:*

Zimmer argues that the Loda patent fails to disclose a base portion and a stem extension that are located on the same side

of a joint. The Court construed "[a] modular prosthesis system comprising a prosthetic base portion ... and a stem extension ..." as encompassing both one-piece and multiple-piece standardized stem extensions, "including a prosthetic base portion ... and a stem extension, that are located on the same side of a joint." Markman Order at 19–20. The Court stated:

> This connection is described in the specification as occurring at the undersurface of the base portion, whereas the other surface of the base portion is attached to an "articular surface or additional portion." '313 patent, col. 2, ll. 57–59. Additionally, the adjacent surfaces of the base portion and stem extension are in a bone cavity. '313 patent, col. 4, ll. 7–21. If the base portion and stem extension could be located on opposite sides of a joint, then the space between the two would be the joint space—where articulation occurs—rather than in a bone cav-

ity. This would be in direct contravention of the specification.

Markman Order at 19.

Zimmer contends that Dr. Laskin's conclusions directly contravene this claim construction. Zimmer stated that Dr. Laskin identified the Loda patent's intramedullary stem (1) as a "stem extension," but characterized guide (7) as a "base portion" and stated that, in the Loda patent, articulation occurs at items (5) and (6), where the threaded hole interacts with the corresponding threaded pin. If, as Zimmer contends, articulation occurs "in the joint space" at (5) and (6), which are located between the stem extension (1) and the base portion (7), the stem extension and base portion are not located on the same side of the joint. Finally, Zimmer argues that the Loda reference allows the stem extension to rotate with the base and, as such, the components are located in a second joint space. For comparison, see figures below:

FIG. 1

FIG. 4

Howmedica disagrees, stating that Dr. Laskin's report supports its conclusion that the base portion and stem extension are located on the same side of a joint in the Loda patent. According to Howmedica, "the Loda reference includes a stem extension (1) and a base portion (7), that are both located on the carpo (wrist) side of the joint. Meanwhile, opposing compo-

nent (9), which is located on the metacarpal (hand) side of the joint, moves against the base (7) so that the patient can flex his or her wrist." Docket No. 259–1 at 19; Ex. A to Zim. Mem., Laskin Rep. at 16, 32–33.

Zimmer has not provided this Court with any evidence—only attorney argu-

ment—that there is "joint space—where articulation occurs"—between the implant parts identified by Dr. Laskin as the stem and the base, that items (1) and (7) are located on opposite sides of the joint, and that the Loda patent allows items (1) and (7) to rotate. As previously discussed, "unsubstantiated attorney argument regarding the meaning of technical evidence is no substitute for competent, substantiated expert testimony." *Invitrogen,* 429 F.3d at 1068. Such wholly conclusory assertions on a legal issue cannot carry Zimmer's burden on summary judgment. *See Biotec Biologische,* 249 F.3d at 1353 (Fed. Cir.2001). Therefore, Zimmer's motion on this issue is denied.

c. *Disclosure of a stem extension for insertion into a cavity in a bone:*

Zimmer argues that the Loda patent cannot invalidate the '313 patent because the Loda patent does not disclose the claimed stem extension for insertion into a cavity in a bone, as required by claim 1 of the '313 patent. Zimmer relies on Dr. Laskin's report, wherein he identified the Loda patent's intramedullary stem (1) to be a "stem extension." Docket No. 212 at 16 (citing Laskin Rep. at 35). According to Zimmer, "[t]here is no dispute that the intramedullary stem (1) ... is inserted into the radius bone of the arm .... [and] no dispute that intramedullary stem (1) is a straight stem ... [with] no connecting portion or elongated stem portion disclosed as part of the intramedullary stem (1) that Dr. Laskin opines is the claimed stem extension." Docket No. 212 at 16. Zimmer claims that "[b]ecause the items Dr. Laskin construed as the stem mounting means (part (4)) and the connection portion (base (3)) are not in a bone cavity, the Loda patent does not disclose the claimed stem extension." Docket No. 212 at 17. Further, Zimmer contends that the stem mounting means (4) and the connection portion (3) are located in the joint

space, not the bone cavity, and that only the "elongated stem portion" (1) is inserted into the radius bone cavity. *Id.* Accordingly, Zimmer argues that the Loda patent does not disclose the claimed stem extension for insertion into a bone.

Howmedica asserts that, on its face, claim 1 only requires that the intradullarly stem (1) be inserted into the radius bone of the arm. Docket No. 259–1 at 20. Howmedica contends that Zimmer erroneously reads additional limitations into the claim language by "rewrit[ing] the claim to require that the stem extension be *entirely* inserted into the bone." *Id.* (emphasis in original).

In the '313 patent, the base portion is comprised of a base mounting means (12), and the stem extension is comprised of a stem mounting portion (2) and an elongated stem portion (3). These are joined by the connection portion (4). '313 patent, col. 2, ll. 50–col. 3, ll. 9. The '313 patent specification states that the connection between the base portion and stem extension occurs at the undersurface of the base portion, that the other surface of the base portion is attached to an articular surface or additional portion, and that the adjacent surfaces of the base portion and stem extension are in a bone cavity. '313 patent, col. 2, ll. 57–59; col. 4, ll. 7–21. By Zimmer's own admission, "[t]here is no dispute that the intramedullary stem [identified by Dr. Laskin as a "stem extension"] (1) ... is inserted into the radius bone of the arm." Docket No. 212 at 16.

Zimmer may well be correct that claim 1 requires that the stem extension be entirely inserted into the bone, but without any evidence to support this claim, the Court cannot make such a conclusion. To do so would be to rely wholly on unsubstantiated attorney argument regarding the meaning of technical evidence, which the Court will not do. *Invitrogen,* 429 F.3d at 1068.

Zimmer's motion for summary judgment on this issue is denied.

## 2. *The Koch Application*

Zimmer contends it is entitled to summary judgment that the Koch application cannot anticipate any asserted claim of the of the '313 patent because Howmedica has failed to present evidence to establish, by clear and convincing evidence, that the Koch application discloses every limitation in claim 1 of the '313 patent. Specifically, Zimmer argues that the Koch application lacks, at least: (1) "the stem extension further having an elongated stem portion connected to the stem mounting means by a connection portion," and (2) "wherein the stem mounting means has a first central longitudinal axis and the elongated stem portion has a second central longitudinal axis substantially parallel to the first axis

but which is spaced apart therefrom to provide an offset therebetween." Docket No. 212 at 17.

Because these claims were not specifically construed by the Court in its claim construction order, they are to be given their ordinary meaning to one of ordinary skill in the art. It is undisputed [for the purposes of this motion] that in the first limitation, the "connection portion" is "any portion of the stem extension between the 'stem mounting means' and the straight portion of the stem extension." *Id.* at 18 (quoting Laskin Rep. at 38). It is also undisputed [for the purposes of this motion] that the second limitation " 're-quire[s] that the first central longitudinal axis of the stem mounting means be substantially parallel to, and offset from, the central longitudinal axis of the elongated stem portion.' " *Id.* (quoting Laskin Rep. at 40). For clarification, see figures below:

*Koch Application, Figures 2, 3, and 4*

Zimmer argues that Howmedica has failed to produce clear and convincing evidence to establish that the Koch application discloses a connection portion. Zimmer argues that the first shaft (2) is not a portion of the stem "between the connection means and the straight portion," but rather is the straight portion of the stem extension [the elongated stem portion]. Additionally, Zimmer contends that the Koch application does not disclose a stem mounting means and an elongated stem portion with two different axes that are parallel and offset because "the Morse taper connection and the elongated stem portion have the same axis, labeled as item 3 on the figure. That the distal end 18 may have some other axis is irrelevant, because its axis is not the axis of the elongated stem portion of the stem extension, but that of a separate tip." Docket No. 212 at 19. Finally, Zimmer contends that when the two limitations are examined simultaneously, it follows that it is the connection portion that provides the offset. According to Zimmer, Howmedica's evidence shows that the connection portion in the Koch application is straight and co-axial with the alleged mounting means and, as such, does not disclose this limitation.

Howmedica disagrees with Zimmer's assessment and argues that the Koch application discloses each element of claim 1 of the '313 patent. Howmedica's expert, Dr. Laskin, stated that the Koch application

stem extension is comprised of three parts: the male Morse taper (4), a first shaft (2), and a distal end (17) or (18). Laskin Rep. at 38–39. Dr. Laskin stated that the first shaft (2) is the "connection portion" recited in claim 1 and that the asymmetric distal end (18) discloses a central longitudinal axis that is spaced apart from and substantially parallel to the axis of the stem mounting means. Laskin Report at 40–41.

Howmedica contends that whether the Koch application lacks (1) a "connection portion" and (2) two central longitudinal axes "spaced apart therefrom to provide an offset therebetween" are pure questions of fact. Docket No. 259–1 at 22 (citing *Beckson Marine v. NFM, Inc.,* 292 F.3d 718, 725 (Fed.Cir.2002)). Moreover, Howmedica stated that a prior art reference need not look exactly like the patent in order to invalidate to support its contention that the offset stem in Koch anticipates the offset stem in the '313 patent even though the offset stems, respectively, do not look identical. Docket No. 259–1 at 22.

This Court also notes the Federal Circuit's holding that the term " 'modular prosthesis system' in the preamble to claim 1 does not require a one-piece stem extension." *Zimmer,* 111 Fed.Appx. at 599. Rather the stem extension can be a one-piece or multiple-piece stem extension. This holding, however, does not resolve the issue of whether the distal offset portion of the stem (16/18), or "stem end," is a "separate tip" as Zimmer contends or rather part of the offset stem extension as asserted by Howmedica. This Court finds that there is a material question of fact as to whether the Koch application discloses two different axes that are parallel and offset. Accordingly, Zimmer's motion for summary judgment on this issue is denied.

## VI. Conclusion

Based on the foregoing analysis, Zimmer's January 24, 2006 Motion for Partial Summary Judgment on Howmedica's Invalidity Defense and Counterclaim (Docket No. 211) is GRANTED IN PART and DENIED IN PART. The following issues are denied as moot: (1) that the Koch application does not anticipate claims 2 or 15–17 of the '313 patent; (2) that the Loda patent does not anticipate or render obvious claims 8 or 9 of the '313 patent; and (3) that the Loda patent does not anticipate claims 15–17 of the '313 patent.

Zimmer's motion for partial summary judgment that the Loda patent is not prior art under § 102(a) is DENIED. (Docket No. 211). Partial summary judgment is GRANTED on Zimmer's motion asserting that the Loda patent is not prior art under § 102(b). (Docket No. 211). Zimmer's motion for partial summary judgment claiming that the Howmedica Kinematic Offset Stem Implant is not prior art under § 102(a) is DENIED. (Docket No. 211). Zimmer's motion for partial summary judgment arguing that the Howmedica Kinematic Offset Stem Implant is prior art under § 102(b) is GRANTED. (Docket No. 211).

Zimmer's motion for partial summary judgment asserting that the Loda patent cannot anticipate any asserted claim of the '313 patent is DENIED. (Docket No. 211). Zimmer's motion for partial summary judgment arguing that the Koch application cannot anticipate any asserted claim of the '313 patent is DENIED. (Docket No. 211).

**SO ORDERED.**